**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Paul Sambursky, | ) | |
| | ) | |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Tim Schuetzle, Warden, North Dakota | ) | |
| State Penitentiary, | ) | Case No. 1:08-cv-068 |
| | ) | |
| Respondent. | ) | |

On September 12, 2008, Respondent filed a Motion to Dismiss Petitioner Paul Sambursky's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody.  For the reasons set forth below, the undersigned recommends that Respondent's motion be granted and that Samburksy's petition be denied.

**I.    BACKGROUND**

In 2001 and 2002, there was a series of sexual assaults in Grand Forks, North Dakota.  In 2003, Sambursky was charged in state district court in six separate cases.  In five of the cases, he was charged with the offense of gross sexual imposition with three of the cases charging a Class A felony and the other two a Class B felony.  The maximum sentence for Class A felony was 20 years and for a Class B felony ten years.  In the sixth case, Sambursky was charged with disorderly conduct, a Class B misdemeanor, for which the maximum sentence was thirty days.  All told, Sambursky faced approximately eighty years if convicted in each of the cases and the sentences were imposed consecutively.  (Sambursky v. State, 2006 ND 223, ¶ 2, 723 N.W.2d 524 (Sambursky I); Docket No. 7-5).

1

The parties reached an initial plea agreement that capped the total amount of imprisonment on the six charges at twenty-one years, not counting any suspensions of sentences. The trial court, however, rejected the plea agreement. (Sambursky I, at ¶ 3; Docket No. 7-13, p. 9).

The parties subsequently entered into an amended plea agreement, which provided that the court could impose a series of consecutive sentences, the total of which would not exceed thirty years imprisonment, not counting suspensions, but the defendant could argue for lesser sentences. (Sambursky I, at ¶ 3; Docket No. 7-4). The state district court accepted the amended plea agreement and Sambursky entered his pleas of guilt in the six cases on December 22, 2003. (Docket No. 7-5).

Sambursky was sentenced on January 13, 2004. The district court rejected Sambursky's plea for a lesser overall prison sentence and imposed the maximum provided for under the plea agreement, which was a total of thirty years. The court did this by imposing consecutive sentences in the five felony cases that totaled thirty years of time to be served with remainder of the time in each case to be suspended and the defendant placed on probation following release. In the misdemeanor case, Sambursky was sentenced to thirty days to run concurrent to the sentence imposed in the first felony case. (Docket Nos 7-6, pp. 63-75).

Following sentencing, Sambursky learned during his orientation at the state penitentiary that he would not become eligible for parole until he had served 85% of his total sentence of thirty years because the offenses of gross sexual imposition to which he had pled were considered violent offenses under N.D.C.C. § 12.1-32-09.1. On March 17, 2004, he filed a motion pursuant to Rule 35 of the North Dakota Rules of Criminal Procedure requesting a reduction of his sentence, credit for time served, and an amendment of his conditions of probation so that he could have contact with his children. (Docket Nos 7-8, 7-8A). The court granted Samburksy credit for time served and

amended the conditions of his probation to clarify that he could see his children. However, it denied his request for a sentence reduction. (Sambursky I, at ¶ 4; Docket No. 7-9).

Sambursky filed an application for post-conviction relief with the state district court on December 2004. (Docket No. 7-10). He claimed that he had not voluntarily entered his pleas of guilty because he had not fully comprehended the consequences of the plea agreement. (Docket Nos. 7-10; 7-10A; & 7-10B). He also asserted a claim of ineffective assistance of counsel on the grounds that counsel had failed to advise him that his sentences were subject to the 85% service requirement codified in N.D.C.C. § 12.1-32-09.1. (Id.)

The state district court (a different judge than the sentencing judge) dismissed Sambursky's application without conducting a hearing. (Docket No. 7-12). On appeal, the North Dakota Supreme Court affirmed in part and reversed in part. The court concluded that the district court had not erred in determining that Sambursky's pleas were made knowingly and voluntarily. Sambursky I, at ¶ 11. However, it also concluded that Sambursky had raised genuine issues of material fact with respect to his claim of ineffective assistance of counsel and was therefore entitled to an evidentiary hearing. Id. at ¶¶ 12-26.

On March 14, 2007, the state district court convened an evidentiary hearing on Sambursky's claim of ineffective assistance of counsel at which both Sambursky and his attorney testified. (Docket No. 7-13). The district court concluded that Sambursky's account was not entirely credible and that he had not been "actively misinformed" about the length of time that he would serve. Consequently, it denied Samburksy's application for post-conviction relief. (Docket No. 7-15).

Sambursky appealed again to the North Dakota Supreme Court, which affirmed the district court's decision in Sambursky v. State, 2008 ND 133, 751 N.W.2d 247 (Sambursky II), opining that

3

Sambursky had "failed to carry his heavy burden to establish that his trial counsel's representation fell below an objective standard of reasonableness." Id. at ¶ 25.

On June 17, 2008, Sambursky filed with this court a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. (Docket No. 2). Respondent filed a Motion to Dismiss Sambursky's petition on the grounds that counsel's performance was not objectively unreasonable and that Sambursky had suffered no demonstrable prejudice. (Docket No. 5). The motion has now been fully briefed and is ripe for this court's consideration.

## II.    SCOPE OF REVIEW

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in violation of the United States Constitution or other federal law. In most cases, this review is limited because, as a matter of federalism and comity, the primary responsibility for ensuring compliance with federal law in state-court criminal proceedings rests with the state courts.

In keeping with this policy, § 2254(d) limits federal-court review when the state courts have addressed the federal claims on the merits to instances when a person is being held in custody pursuant to a state-court decision that (1) is directly contrary to established federal law as enunciated by the United States Supreme Court, (2) is an objectively unreasonable application of Supreme Court precedent, or (3) is based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d); see generally Woodford v. Visciotti, 537 U.S. 19, 26-27 (2002 (per curiam); Williams v. Taylor, 529 U.S. 362, 399-413 (2000);

4

Williams v. Taylor, 529 U.S. 420, 436-437 (2000).[1]  This highly deferential standard of review under § 2254(d) is often referred to as "AEDPA deference" because it was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  E.g.  Pederson v. Fabian, 491 F.3d 816, 824-825 (8th Cir. 2007).

Also, in keeping with the policy of placing primary responsibility for the enforcement of federal rights upon the state courts, § 2254 imposes a number of additional rules and procedures to limit federal-court "retrials" of state-court criminal proceedings under the guise of federal habeas corpus.  See Bell v. Cone, 535 U.S. 685, 693 (2003).  Subdivisions (b) & (c) impose the long-standing requirement that federal courts may only consider habeas claims that have first been exhausted using available state-law procedures.  Subdivision (e)(2) requires that the petitioner develop the factual bases for the federal claims in the state-court proceedings by limiting the availability of federal evidentiary hearings to those situations in which the federal claims rely upon a new, retroactive law or are based on facts that could not have been previously discovered by the exercise of due diligence. Finally, subdivision (e)(1) provides that state-court factual findings carry a presumption of correctness, which can only be rebutted by clear and convincing evidence.

---

[1] The Supreme Court has held that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning and has described the differences as follows:

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  Id., at 405-406, 120 S.Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  Id., at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one.  Id., at 409- 410, 120 S.Ct. 1495. See also id., at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Bell v. Cone, 535 U.S. 685, 694 (2002); see also Early v. Packer, 537 U.S. 3, 7-11 (2002) (per curiam).

**III.** **DISCUSSION**

    **A.** **Introduction**

    The North Dakota Supreme Court concluded in <u>Sambursky I</u> that a mere failure to inform a criminal defendant of a minimum service requirement for parole would not be ineffective assistance of counsel, but that providing "active misinformation" would satisfy the first prong for an ineffective assistance claim under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Sambursky I</u>, at ¶ 18-21. The court then remanded the case to the district court solely to determine whether counsel had provided "active misinformation."

    After conducting a hearing, the state district court concluded that, while counsel had failed to inform Sambursky of the 85% minimum service requirement, there was no "active misrepresentation." In <u>Sambursky II</u>, the North Dakota Supreme court affirmed, concluding that Sambursky had failed to meet his burden of proof with respect to a claim of ineffective assistance based upon "active misinformation." <u>Sambursky II</u>, at ¶ 25. Notably, neither the state district court nor the Supreme Court reached the second prong under <u>Strickland</u>, *i.e.*, whether Sambursky suffered any prejudice.

    In his habeas petition to this court, the only issue raised by Sambursky is his Sixth Amendment ineffective assistance claim that counsel affirmatively provided erroneous information about his eligibility for parole and that, but for this, he would not have pled guilty. In other words, he is only disagreeing with the North Dakota Supreme Court's disposition in <u>Sambursky II</u> and is not contending that the mere failure to provide advice regarding parole eligibility constitutes ineffective assistance. (Docket Nos. 2 & 8).

Since the state court resolved Samburksy's affirmative misrepresentation claim solely on the basis of the first Strickland prong, this will be discussed first. However, given the troubling issues that exist with respect to the first Strickland prong, the recommendation will be that Sambursky's claim be denied for his having failed to satisfy the second Strickland prong.

### B.     Law governing ineffective assistance of counsel

Under Strickland v. Washington, supra, a defendant who claims ineffectiveness of counsel must ordinarily demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defendant.[2]  The test for deficient performance under the "first Strickland prong" is whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  466 U.S. at 688; Rompilla v. Beard, 545 U.S. 374, 380 (2005); Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005).  In making this determination, a state or federal court must:

> ". . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. *Id.* at 689, 104 S.Ct. at 2065.

Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995).

Under the "second Strickland prong," prejudice is only shown when "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  E.g., Woodford v. Visciotti, 537 U.S. at 22 (quoting Strickland, 466 U.S. at 694 and

---

[2]  There are three situations in which a Sixth Amendment violation may be presumed without consideration of the "performance" and "prejudice" components of Strickland: (1) when the accused is actually or constructively denied counsel during a critical stage of the criminal proceeding, (2) when counsel fails to subject the government's case to a meaningful adversarial testing, which failure must be complete and not limited to isolated portions of the proceeding, or (3) when circumstances are present that even competent counsel could not render effective assistance.  E.g., Bell v. Cone, 535 U.S. at 695-697; United States v. White, 341 F.3d 673, 677-679 (8th Cir. 2003).  None are applicable here.

adding emphasis); Perry v. Kemna, 356 F.3d 880, 888 (8th Cir. 2004).  "A reasonable probability is a probability sufficient to undermine the confidence in the outcome."  Woodford v. Visciotti, 537 U.S. at 23 (quoting Strickland, 466 U.S. at 694).

### C.     The state court findings and conclusions

In this case, since the North Dakota Supreme Court addressed Sambursky's claim of ineffective assistance of counsel on the merits, this court must first look to its decision in applying AEDPA's standards. Mark v. Ault, 498 F.3d 775, 783 (8th Cir. 2007) ("we apply the AEDPA standard to the . . . 'last reasoned decision' of the state courts").  And, rather than trying to summarize the North Dakota Supreme Court's findings and conclusions, it is easier simply to quote from its decisions as follows:

> [¶ 12] Here, the district court, after an evidentiary hearing, found Sambursky had not proven his attorney "actively misinformed" him about the length of time he would serve in the state penitentiary under the plea agreement. In reaching its conclusion, the court made a number of credibility determinations and findings regarding both Sambursky's testimony and his trial counsel's testimony at the evidentiary hearing. "The task of weighing the evidence and judging the credibility of witnesses belongs exclusively to the trier of fact, and we do not reweigh credibility or resolve conflicts in the evidence." Greywind v. State, 2004 ND 213, ¶ 22, 689 N.W.2d 390; see also Patten, 2008 ND 29, ¶ 11, 745 N.W.2d 626.
>
> [¶ 13] In concluding Sambursky had not met his burden under the Strickland "performance" prong, the district court found that Sambursky's trial counsel had merely failed to inform Sambursky of the 85 percent service requirement and that trial counsel's performance, therefore, fell within the range of reasonable professional assistance.
>
> [¶ 14] The district court found that the parties did not dispute Sambursky was informed during his state penitentiary orientation that the 85 percent service requirement applied to him and that he had to serve approximately 25 years before he would be eligible for parole. The court also found it was undisputed that trial counsel did not advise Sambursky that he would be subject to the 85 percent requirement before his entry into both the first and second plea agreements or before sentencing. The district court found that Sambursky's testimony and his trial counsel's testimony were directly contradictory as to whether trial counsel actually misinformed Sambursky as to the amount of time he would serve in the penitentiary under the plea agreement. The district court stated:

Sambursky testifies that on three (3) occasions prior to entering into the first plea agreement he specifically asked his attorney about the 85 % rule and his attorney advised him that it did not apply to him and further that his attorney also advised him that after one year he could apply for parole and be released early if he behaved. Whereas [trial counsel] testifies that Sambursky never brought up the 85% rule or sentencing violent offenders until after sentencing, that he never knew about the 85% service requirement until after sentencing, and that he never promised any early release from prison and had specifically advised Sambursky that he had no right to parole or early release. This court, as the fact finder, has to determine credibility of Sambursky and [trial counsel] and in doing so the court may consider other evidence that may either support or contradict the testimony of the parties as well as consistency or inconsistency of testimony, demeanor of witnesses, and motivation for testimony.

[¶ 15] In its memorandum decision, the district court examined the testimony of both Sambursky and his trial counsel in reaching its conclusion. The court stated Sambursky had testified that his trial counsel misled him because trial counsel told him the 85 percent service requirement did not apply to him when he specifically asked about the 85 percent rule. Sambursky testified that trial counsel also told him that he could apply for parole after one year in the penitentiary regardless of how much time he received. Sambursky testified that before he signed the first plea agreement, another inmate told him about the 85 percent rule and that the very next day he asked his trial counsel about the 85 percent rule. Sambursky testified trial counsel specifically told him the 85 percent rule did not apply to him because he was not considered a violent offender. Sambursky indicated there were two additional times before entering into the first plea agreement that he had asked his trial counsel about the 85 percent rule, and his trial counsel again told him the 85 percent rule did not apply to him. Sambursky testified that after the third time, trial counsel told him he had talked to the parole board and had done some legal research on the issue and again said the 85 percent rule did not apply to him. Sambursky testified that he specifically used the term "85 percent" when discussing this with his trial counsel. The district court found Sambursky's assertions were not credible.

[¶ 16] On the other hand, Sambursky's trial counsel testified that Sambursky never asked him about an 85 percent rule or sentencing of violent offenders until after Sambursky was sentenced. Despite Sambursky's assertion to the contrary, trial counsel testified Sambursky first asked him about the 85 percent rule a couple of days after sentencing when Sambursky called him from the Grand Forks correctional center and said another inmate had told him about the rule. Trial counsel testified it was this discussion that prompted the filing of the request for a reduction in sentence under N.D.R.Crim.P. 35.

[¶ 17] Trial counsel denied he had ever told Sambursky that he would have to serve less time than what was agreed to in the plea agreements. Trial counsel testified that he had called the parole board midway through his representation of

9

Sambursky to answer a question Sambursky had asked. In its memorandum opinion, the district court stated, "[Trial counsel] testified that Sambursky wanted [him] to find out if there were any rights a convict in North Dakota has to parole ... any hard and fast rules or rights of a convict as to when he could be considered for parole." Trial counsel testified that the parole board told him there were no rights to parole and this was discretionary with the board. Trial counsel then advised Sambursky of the parole board's answer that a convict had no right to parole. Trial counsel said this was the only discussion he had with Sambursky regarding parole rights. Counsel's testimony contradicts Sambursky's testimony on this issue.

[¶ 18] On appeal, Sambursky asserts the district court erred in finding that because trial counsel testified Sambursky did not specifically ask about the 85 percent rule, there was no active misinformation. Sambursky asserts that even if he had asked his counsel only about his parole eligibility and not the 85 percent rule, trial counsel had an additional obligation "to clarify he understood Sambursky's question" and provide accurate information. However, Sambursky also concedes it is unchallenged that trial counsel informed Sambursky that he was not subject to any mandatory minimum sentence and that North Dakota had no parolee rights and that both of these statements were factually accurate. Further, hearing testimony established that trial counsel denied ever telling Sambursky he would serve less time than what was agreed to in the plea agreements and that Sambursky understood he could serve up to 30 years under the second plea agreement.

[¶ 19] The district court also weighed trial counsel's testimony that his representation of Sambursky in the plea negotiations and discussions with Sambursky "focused on the maximum sentence of incarceration and trying to limit the number of years of incarceration specified [in] the plea agreement because, without a right to parole, Sambursky could serve the maximum." The district court also found significant that, at the evidentiary hearing, Sambursky testified he understood there was a possibility he could serve 21 years under the first plea agreement and that in discussing the second plea agreement with his trial counsel, Sambursky knew at sentencing they would be arguing for a downward departure from the 30 years provided in the plea agreement. Importantly, Sambursky also testified he was aware he could serve up to 30 years in the penitentiary under the second plea agreement.

[¶ 20] In resolving the contradictory testimony between Sambursky and his trial counsel, the district court examined additional evidence to either support or contradict the testimony of the parties. The district court addressed a February 2004 letter, which Sambursky argued was, in effect, an admission by his trial counsel that he had incorrectly advised him that the 85 percent rule did not apply. In the letter, trial counsel had stated: "I am sorry we [were] wrong about the 85 percent sentencing, but I don't think it would have made any difference at the time of sentencing." The district court, however, found trial counsel's explanation of the letter at the evidentiary hearing plausible. Trial counsel testified that he was expressing that he was wrong in not knowing about the 85 percent rule and was sorry he did not know about the rule so he could have advised Sambursky about the rule.

[¶ 21] In support of trial counsel's testimony, the district court also looked to the brief trial counsel filed in support of the motion for reduction in sentence under N.D.R.Crim.P. 35. The court pointed out the brief asserted there were four things Sambursky learned during penitentiary orientation that were not known at sentencing, the first of which was the 85 percent sentencing requirement. The court noted the motion and brief were served on Sambursky at the penitentiary and there was no evidence Sambursky objected to or attempted to correct the brief. Further, the court found that Sambursky did not indicate he was misled by his attorney relating to the 85 percent service requirement in a letter from Sambursky that was filed in support of his motion. The court found Sambursky was unable to provide a sufficient explanation for that letter at the evidentiary hearing. The court also found it was significant that Sambursky did not allege his attorney had misled him until his post-conviction relief application, "approximately 11 months after he was informed that the 85% service requirement applies to him."

[¶ 22] The district court also found there was no documentary evidence that the 85 percent rule was discussed between Sambursky and trial counsel before sentencing. The court did, however, discuss documentary evidence supporting trial counsel's assertion that Sambursky did not ask him about the 85 percent service requirement before sentencing and that trial counsel had never promised Sambursky he would be eligible for early release from prison through parole. The court focused on a December 2003 letter from trial counsel to Sambursky, in which trial counsel summarized the focus they were taking at the sentencing hearing. The district court observed that Sambursky had signed an acknowledgment at the bottom of the letter indicating he received and understood the letter. The district court again found significant that this letter did not mention parole, early release, or the 85 percent requirement. During the hearing, trial counsel testified that his letter attempted to address every issue he discussed with Sambursky relating to sentencing. Trial counsel testified the 85 percent rule had not been discussed and was not an issue. Trial counsel testified he could not have discussed the 85 percent rule with Sambursky before sentencing because he did not know about the rule.

[¶ 23] The district court, finding the December 2003 letter supported trial counsel's testimony, stated that "they were focusing on getting the court to depart downward from the years of incarceration called for in the plea agreement in an attempt to minimize the time Sambursky would have to serve and his belief and subsequent advise [sic] to Sambursky that there was no right to parole or early release." The court considered the letter to be a "careful outline" of the issues trial counsel and Sambursky discussed regarding the upcoming sentencing hearing. The court found that if trial counsel and Sambursky had discussed the 85 percent service requirement, it would have been addressed in his letter.

[¶ 24] The district court also specifically found that Sambursky admitted he would try anything to "null and void the plea agreement" so he could go to trial. On the other hand, the court found trial counsel had freely admitted to not knowing about the 85 percent service requirement and not advising Sambursky about the rule. The court found trial counsel did not appear to be hiding anything and was very open

11

about what had happened. The court found there was nothing for the trial counsel to gain by his testimony, whereas Sambursky by his own admission had nothing to lose, but stood to gain a trial. The district court ultimately found Sambursky's testimony was not credible "when taken in the context of the other evidence presented at the evidentiary hearing and the pleadings filed in the above cases and also taking into consideration the motivation that exists for Sambursky to not be truthful."

[¶ 25] We conclude the district court did not err in finding that Sambursky's trial counsel did not "actively misinform" him about the length of time he would serve in the state penitentiary under the plea agreement and that the evidence demonstrated his trial counsel merely failed to inform Sambursky of the 85 percent service requirement. On the basis of the record and the district court's findings of fact, we are not left with a definite and firm conviction a mistake has been made. We therefore conclude Sambursky failed to carry his heavy burden to establish that his trial counsel's representation fell below an objective standard of reasonableness.

Sambursky II, at ¶¶ 12-25

### D.    The first Strickland prong

The state district court concluded that Sambursky had not asked his counsel specifically about the 85% service requirement before becoming eligible for parole as Sambursky claimed, and that counsel had made no specific prediction as to when he would become eligible for parole.  The North Dakota Supreme Court accepted these findings, which, as noted above, carry a presumption of correctness under AEDPA that can only be rebutted by clear and convincing evidence.

Here, there is more than sufficient evidence to support the finding that Sambursky had not inquired specifically about the 85% service requirement and that counsel made no specific prediction in terms of years that would have to be served before Sambursky would be eligible for parole.  Also, the testimony of Sambursky and his counsel on these points was directly in conflict, and the state district judge had the benefit of being able to observe and consider the demeanor of the witnesses.  But, even if you discount Sambursky's testimony and accept only that of his attorney, there remains troublesome questions as to whether counsel provided "active misinformation" and whether his

12

performance otherwise "fell below an objective standard of reasonableness under prevailing professional norms" within the meaning of <u>Strickland.</u>

It is undisputed that counsel checked with parole officials prior to Sambursky's change of plea and he did so because of questions posed by Sambursky.  Further, it is also undisputed that sometime after sentencing counsel wrote Sambursky:  "I am sorry we [were] wrong about the 85 percent sentencing, but I don't think it would have made any difference at the time of sentencing." <u>Sambursky II</u>, at ¶¶ 17, 20.

If Sambursky did not ask his counsel about the 85% requirement specifically, then what did he ask?  And, what was counsel's response?  In evaluating whether counsel's performance was deficient within the meaning of the first <u>Strickland</u> prong, it would seem that these are relevant questions.  <u>See</u>, <u>e.g.</u>, <u>Buchheit v. Norris</u>, 459 F.3d 849, 853 (8th Cir. 2006) (discussed later herein); <u>Goodall v. United States</u>, 759 A.2d 1077, 1084 (D.C. 2000) (remanding to consider similar questions with respect to an 85% minimum service requirement for parole).

As already observed, the state district court rejected Sambursky's testimony that he had specifically asked about the 85% percent requirement.  Beyond that, neither the state district court nor the North Dakota Supreme Court made a specific finding as to what question Sambursky did ask.  Both courts, however, referenced the testimony of Sambursky's attorney, with the North Dakota Supreme Court stating:

> In its memorandum opinion, the district court stated, "[Trial counsel] testified that Sambursky wanted [him] to find out if there were any rights a convict in North Dakota has to parole ... any **hard and fast rules or rights** of a convict as to **when** he **could be considered** for parole."

<u>Sambursky II</u>, at ¶ 17 (emphasis added); see also Docket No. 7-15.

13

Consequently, in the absence of a more specific finding and since there is no other relevant evidence, it must be assumed the foregoing was the inquiry that was actually made.  And, on its face, it is an inquiry about whether there were rules or rights governing when Sambursky could become eligible for parole.

As for counsel's response, again both the district court and the North Dakota Supreme Court made reference to counsel's testimony, with the North Dakota Supreme Court stating:

> Trial counsel testified that the parole board told him there were no rights to parole and this was discretionary with the board. Trial counsel then advised Sambursky of the parole board's answer that a convict had no right to parole. Trial counsel said this was the only discussion he had with Sambursky regarding parole rights.

Sambursky II, at ¶ 17; see also Docket No. 7-15.  Notably, it is unclear from the foregoing whether the state court found that  Sambursky was told only that he had no right to parole or whether he was also expressly advised that parole was discretionary.

But, assuming for the moment it is only the former, the state district court never directly addressed whether counsel's advice that Sambursky had no right to parole was an adequate response to the question that had been asked, i.e., whether there were any rules or rights governing when Sambursky could become eligible for parole, or whether counsel's response was misleading in the context of the discussion that was taking place between Sambursky and counsel.  Rather, the court focused its discussion on whether it should credit Sambursky's testimony, that he had specifically inquired about the 85% requirement and was told there was no such requirement, or counsel's testimony, that Samburksy had not asked about the 85% requirement and that he only advised Sambursky there were no rights to parole.  (Docket No. 7-15, pp. 4-10).  After deciding that counsel's account was the more credible, the court concluded that counsel had "merely failed to inform Sambursky of the 85% service requirement" and that Sambursky had "not proven that his

attorney actively misinformed him about the length of time he [would] . . . serve in the state penitentiary under the plea agreement." (Id. at p.10).

In affirming the district court's decision, the North Dakota Supreme Court came closer to addressing the issues of the adequacy of counsel's response and whether it was contextually misleading, when the court stated:

> On appeal, Sambursky asserts the district court erred in finding that because trial counsel testified Sambursky did not specifically ask about the 85 percent rule, there was no active misinformation. Sambursky asserts that even if he had asked his counsel only about his parole eligibility and not the 85 percent rule, trial counsel had an additional obligation "to clarify he understood Sambursky's question" and provide accurate information. However, Sambursky also concedes it is unchallenged that trial counsel informed Sambursky that he was not subject to any mandatory minimum sentence and that North Dakota had no parolee rights and that both of these statements were factually accurate. Further, hearing testimony established that trial counsel denied ever telling Sambursky he would serve less time than what was agreed to in the plea agreements and that Sambursky understood he could serve up to 30 years under the second plea agreement.

Sambursky II, at ¶ 18.

Before turning to the issues of the adequacy of counsel's response and whether it was contextually misleading, some discussion regarding what counsel meant when he told Sambursky that there was "no right to parole" is in order. This is because the response could have different meanings depending upon the context.

One possible meaning that could be attributed to counsel's response of no right to parole is that there would be no possibility of parole whatsoever. In other words, Sambursky would never be eligible. Under North Dakota law, this would not be an accurate response since the possibility for parole exists after Sambursky has served 85% of his sentence under N.D.C.C. § 12.1-32-09.1.

Another meaning of the response of "no right to parole" is that there is no guarantee of parole but that parole remains a possibility. This is the sense that the North Dakota Supreme Court

attributed to counsel's response given, among other things, the court's statement that the advice of there being no right to parole was accurate. <u>Sambursky II</u>, at ¶ 18. However, to the extent there is any doubt, the actual testimony of counsel, which is set forth in detail later, makes clear this was what he meant.

And, if that was the sense of what counsel conveyed to Sambursky, the question of whether it was affirmatively misleading is a troublesome one. First, there is no question about the fact the advice was affirmative. Here, the state court concluded, at least implicitly, that Sambursky had asked about whether there were any rules or rights governing his parole eligibility. And, rather than ignoring the question or simply saying he did not know, counsel professed to have checked with the parole board and then proceeded to advise what he had learned. Second, counsel's response that there were no right to parole, in the sense of there being no guarantee of parole but parole being a possibility, was not entirely accurate since parole is not a possibility until Sambursky serves 85% of his sentence. In other words, there is a hard and fast rule governing when Sambursky would be eligible for parole, contrary to what counsel's response arguably suggested.

Further, the issue of whether counsel affirmatively provided misleading information is an even closer one if Sambursky also specifically told him that parole was discretionary. This is because parole is not discretionary in Sambursky's case until 85% of the sentence has been served.

As noted earlier, the state court's discussion is somewhat vague in terms whether Sambursky was specifically told that parole was discretionary in addition to whatever was implicitly conveyed by the advice that there were no right to parole. The actual testimony of counsel, however, supports the conclusion that he specifically told Sambursky that parole was discretionary in addition to there

being no right to parole.  And, given that the state court otherwise credited counsel's testimony and

there being no other witnesses, there is no principled reason for discounting it.  Counsel testified:

Q:     Did you ever refer to parole rights in any of the written communication that you had with Mr. Sambursky?

A.     No, I mean, other than to report back to him that I did what I did.  I did call the Parole Board and ask them the question.  And the reason why I went that far was because he asked me to.

Q:     And it's your testimony that he used the specific words "parole rights"?

A:     I don't recall if he used that specific word, but that's how I understood it.

Q:     Could you provide more detail about the conversation that you had with Mr. Sambursky about--that led you to make the call to the parole Board?

A:     He asked if there were any hard and fast policies or rules that would give a convict parolee rights?  That was the essence of it.  Maybe he didn't put it in exactly those words, **but he wanted to know if there was any statutes, rules, regulations, or policies that govern parole?**  And the answer to that-- that I gave him after calling the Parole board was, no, there are no rights.

Q:     So you answered him, that there were no statutes covering parole rights?

A:     Well, I don't think I put that question exactly the way you phrased it, but...

Q:     You stated--you just stated that--

A:     Yeah.

Q:     --that you--

A:     I wanted to find out if there was any rights given to convicts.

Q:     And that was how Mr. Sambursky was asking that question, was rights?

A:     I don't know.  **What I remember is that he wanted to know if there was any regulations and rules that govern that situation.**

Q:     That govern which situation?

A:     Parole.  Parole.

17

Q:      **So he was asking specifically about rules, statutes, regulations that govern parole?**

A:      **That's correct.**

Q:      And you specifically told him that there were no statutes, regulations or rules regulating parole?

A:      No.  I told him there were no parolee rights.

Q:      But that wasn't the answer to the question that he asked then?

A:      Well, my answer is no, because all I--**what I informed him of is that the Parole Board informed me that everything they do is discretionary.  So people that have been convicted of a crime do not have any hard and fast policy rights.**  I mean . . . .

Q:      Prior to your representation of Mr.  Sambursky, were you aware of what's terms as the 85 percent rule?

A:      No.

Q:      At what point did you become aware of that?

A:      About two days after he was sentenced.

(Docket No.  7-13, pp. 75-77) (emphasis added).

In Hill v. Lockhart, 474 U.S. 52 (1985), the United States Supreme Court held that the  right

to effective representation of counsel extends to the entry of a plea of guilty and that the two prong

test adopted in Strickland for judging ineffective assistance during sentencing should apply in the

context of a guilty plea as well.   Respondent argues that Hill did not address what he claims is the

issue in this case: "whether trial counsel's failure to inform Sambursky he would not be eligible for

parole right away because of the 85% service rule is professionally unreasonable."   Respondent

further argues that, given this and the lack of any other Supreme Court precedent directly on point,

the conclusion reached by North Dakota Supreme Court, that Sambursky had not satisfied the first

Strickland prong, cannot be an unreasonable application of clearly established federal law as enunciated by the Supreme Court under AEDPA. In support of these arguments, Respondent cites the Eighth Circuit's decision in Buchheit v. Norris, supra.

In Buchheit, the Eighth Circuit held that the prisoner in that case had not satisfied the first Strickland prong with respect to a claim of failure to advise of a similar minimum service requirement for parole under Arkansas law. 459 F3d at 852-853. The court held that the Arkansas Supreme Court's conclusion, that the failure of defense counsel to advise of the minimum service requirement did not fall outside the range of competence expected of defense counsel under the first Strickland prong, was not directly contrary to Hill, and that the defendant had not cited to the court any other applicable Supreme Court precedent. Id,

But, this a different case than Buchheit. In Buchheit, the Eighth Circuit noted that Buchheit "did not request information about parole from his attorney and he was not given incorrect factual information." 459 F.3d at 853. And, the reason the court expressed this caveat is because it had in at least two prior cases, including one considered *en banc,* granted habeas relief to defendants who had been given incorrect information about similar minimum service requirements for parole on the grounds that it constituted ineffective assistance under Strickland. Id.; see Garmon v. Lockhart, 938 F.2d 120 (8th Cir. 1991); Hill v. Lockhart, 894 F.2d 1009 (8th Cir. 1990) (*en banc*) (affirming the reasoning of the vacated panel decision in Hill v. Lockhart, 903 F.2d 545 (8th Cir. 1990)).

As noted earlier, Sambursky is not contending that he is entitled to habeas relief simply on account of a mere failure to advise him of the 85% service requirement. Rather, as the North Dakota Supreme Court discussed in Sambursky II, one of his contentions is that he asked whether there were any hard or fast rules governing eligibility for parole and was provided with inaccurate information.

19

And, to the extent that counsel affirmatively provided misleading advice, and putting aside for the moment the second prong of <u>Strickland</u>, this case is arguably closer to the Eighth Circuit cases in which the court concluded there was ineffective assistance of counsel and granted habeas relief.

It is true, as noted in <u>Buchheit</u>, that the prior Eighth Circuit cases granting habeas relief were pre-AEDPA.   But, in this case, we have somewhat of an unusual situation: The North Dakota Supreme Court has already concluded in <u>Sambursky I</u> that, while a mere failure to inform of the 85% minimum service requirement would not satisfy the first <u>Strickland</u> prong, providing affirmative misinformation would.   And, Respondent has not claimed that the North Dakota Supreme Court got it right with respect to the first conclusion but wrong in terms of the second.

Morever, it cannot be said it is an unreasonable application of <u>Strickland</u> for the North Dakota Supreme Court to conclude that affirmatively providing erroneous advice about parole eligibility satisfies the first <u>Strickland</u> prong.   This is because, in addition to the Eighth Circuit cases previously cited, a number of other courts have held or suggested that affirmatively providing erroneous advice in this context falls outside that range of competent professional advice that is expected of criminal defense attorneys.   <u>Pickard v. Thompson</u>, 170 Fed.Appx. 86, 2006 WL 719263 at *1 n.2 (11th Cir.  2006) (unpublished per curiam) (noting that affirmative misrepresentation in response to a specific inquiry may constitute ineffective assistance);  <u>Beavers v. Saffle</u>, 216 F.3d 918, 925 (10th Cir. 2000) (gross misadvice regarding parole eligibility can amount to ineffective assistance of counsel and remanding for a hearing and citing other cases); <u>Meyers v. Gillis</u>, 93 F.3d 1147, 1153-54 (3d Cir.1996) (discussing the issue and citing other cases); <u>James v. Cain</u>, 56 F.3d 662, 667-69 (5th Cir.1995)(remanding for consideration of whether, among other things, counsel affirmatively misinformed the defendant about parole);  <u>Cepulonis v. Ponte</u>, 699 F.2d 573, 577 (1st

20

Cir.1983) (noting that "misinformation [about parole eligibility] may be more vulnerable to constitutional challenge than mere lack of information"); Stader v. Garrison, 611 F.2d 61 (4th Cir. 1979) (holding that gross misadvice amounted to ineffective assistance of counsel and granting habeas relief);  Davis v. Murrell, 619 S.E.2d 662, 663-664 (Ga. 2005) (ineffective assistance to advise that defendant would be eligible for parole after 10 years of a 20-year sentence when prior conviction for a violent felony made defendant ineligible for parole); Goodall v. United States, 759 A.2d 1077 (D.C. 2000)  ("representation is constitutionally deficient if counsel provides materially erroneous information regarding the parole consequences of a plea, and the defendant relies upon it"); Tillman v. Gee, 667 S.E.2d 600, 602 (Ga 2008) ("Affirmatively misinforming a client about parole eligibility falls outside the permitted range of professional competence."); Dobbins v. State, 187 S.W.3d 865, 867 (Mo. 2006) (en banc) (attorney misinforming defendant about eligibility for early release was ineffective when defendant was ineligible because of a prior felony conviction); Knox v. State, 530 S.E.2d 887, 889 (S. C. 2000) (noting that giving erroneous advice with respect to parole can be grounds for an ineffective assistance claim and citing prior precedent).[3]

Similarly, a number of courts have reached the same conclusion with respect to erroneous advice about other collateral matters.  E.g., United States v. Kwan, 407 F.3d 1005, 10015-16 (9th

---

[3]  Even if Respondent was to claim it would not be an unreasonable application of prior Supreme Court precedent for a state court to conclude that providing erroneous advice about a collateral matter such as parole eligibility would not violate the Sixth Amendment, since Hill did not directly decide that issue and there being no other Supreme Court case directly on point, there seems no principled reason why  the issue of "unreasonable application" could not be resolved based upon Strickland alone, particularly since the providing of erroneous advice about a material matter is clearly beyond professional norms.  See, e.g., Beavers v. Saffle, supra; cf.  Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-2859 (2007); Marcrum v. Luebbers, 509 F.3d 489, 504-505 (8th Cir. 2007); but cf. Commonwealth v. Padilla, 253 S.W.3d 482 (Ky 2008), cert. granted, __ S.Ct. __, 2009 WL 425077 (Mem) (U.S. 2009) (refusing to consider whether providing erroneous advice regarding the possibility of deportation was ineffective assistance because the Sixth Amendment's guarantee does not reach collateral matters; but, as noted, the Supreme Court has granted the petition for certiorari in this case).

Cir.2005) (holding that "affirmative misrepresentation" of deportation consequences is objectively unreasonable under the first prong of Strickland);  United States v. Couto, 311 F.3d 179, 187-188 (2d Cir. 2002) (same); Finch v. Vaughn, 67 F.3d 909 (11th Cir. 1995) (misadvice that federal sentence would run concurrent to a state sentence amounted to ineffective assistance).

In many respects, this case is similar to that of Goodall v. United States, supra.  In Goodall, the defendant plead guilty to the offense of manslaughter while armed in return for the dismissal of other charges.  Under District of Columbia law, the defendant had faced a minimum mandatory sentence of five years, up to the possibility of life imprisonment.  He was sentenced to an indeterminate term of fifteen years to life, and, under District law, he was not eligible for parole until he had served 85% of the bottom range of his indeterminate sentence, or approximately 13½ years.

As in this case, the defendant in Goodall claimed he did not learn of the 85% minimum service requirement until after he was imprisoned.  He claimed he had been told by his attorney that he would be eligible for parole at the end of the five year minimum mandatory part of his sentence.

The court in Goodall discussed at some length what it considered to be the ambiguous statements made by counsel, both at the time of defendant's change of plea and also later in an affidavit detailing the advice counsel claimed to have given, and the confusion this could have created for the defendant in terms of his understanding of when he would become eligible for parole. The court stated in part the following:

> Moreover, in her affidavit filed in connection with the § 23-110 motion, counsel appeared to hedge about what she had told Goodall in regard to his parole eligibility. She acknowledged that she had not "properly advised him that, if the Court imposed a sentence of 15 years to life ... he would be required to serve approximately 85% of the 'bottom' before parole eligibility." What she had told him was
>> that the five year mandatory minimum sentence would apply to his case, ...
>> [and] that the parole board would not act before the five year mandatory

22

> minimum period was up, but after that he would be eligible for parole, depending upon the length of the sentence he received.
>
> To a defendant unversed in the law, the meaning of this advice would hardly have been unambiguous. The government reads it as telling Goodall that the actual "length of the [minimum] sentence he received," not the statutorily prescribed minimum, would determine his parole eligibility. But telling him that "the parole board would not act before the five year mandatory minimum period was up" could equally have led him to believe that "after that [period] he would be eligible for parole," with his chances depending realistically "upon the length of the sentence he received"- i.e., the maximum sentence. Once counsel undertook to advise Goodall of his parole eligibility in relation to the mandatory minimum sentence, she was obliged to be careful that he did not misunderstand that relationship by thinking the five-year term was both a floor and a cap on his disqualification from parole consideration. Goodall has raised sufficient concern that counsel fostered this misunderstanding to require a hearing on his Sixth Amendment claim.

758 A.2d at 1084.

In this case, there are similar concerns about whether counsel provided information that was misleading after having undertaken to provide advice about parole.  As in Gooddall, it is easy to see how Sambursky, who is unversed in the law and who had inquired about whether there were any rules or rights governing parole eligibility, could reasonably conclude there were no impediments to his parole eligibility when he was advised by counsel that there was no right to parole, in the sense of there being no guarantee of parole, and that parole was discretionary.

In summary, the question of whether the advice given by Sambursky's counsel was within prevailing professional norms on an objective basis is a particularly close one.  But, it is an issue that the court need not resolve.   This is because, after a careful review of the state-court record, it is clear that Sambursky failed to carry his burden of demonstrating prejudice as required by the second prong of  Strickland.

### E.      The second <u>Strickland</u> prong

Sambursky maintains that he would have risked trial and pled not guilty had he been correctly advised of the existence of the 85% minimum service requirement for parole eligibility. However, the record does not support that this would have been a reasonable probability, which, under the Supreme Court's decision in <u>Hill</u>, is the test for satisfying the second <u>Strickland</u> prong in this context.  474 U.S. at 59.

First, neither Sambursky nor his counsel believed that trial was a viable option given the weight of the evidence, despite Sambursky's claim now to the contrary.  (Docket Nos. 7-13, pp. 27, 73; 7-13A, pp. 7, 9-10 ).   In fact, Sambursky testified during his state-court hearing:

> Well, [counsel] . . .   felt pretty confident, at the that time, that he could not win a trial and, and didn't-- you know, you guys had the charges stacked up against me pretty hard.  And we didn't want to fight the evidence.

(Docket No.  7-13, p.  27).  Likewise, in a letter written to his attorney from prison shortly before applying for state post-conviction relief, Sambursky again acknowledged the weight of the evidence, stating that the "truth" might get one of the Class A felonies reduced to a Class B felony - an insignificant reduction in the context of a total exposure of some eighty years.  Sambursky wrote:

> What I am trying to do is find a way to null & void the Plea agreement so that I can go to trial. I have nothing to lose.  **Nothing besides the truth should get me 10 less years.  As one of the "A" felonies should be a "B" felony.**

(Docket No. 7-13B-9) (emphasis added).

Second, Sambursky was charged with not one - not two - but *six* separate incidents of sexual assault, three of which were Class A felonies.  Further, he was facing a state court judge who had already signaled that she was going to impose lengthy consecutive sentences by her rejection of the first plea agreement  that would have capped Sambursky's total sentence at twenty-one years.

Faced with these prospects, the evidence supports counsel's testimony that their efforts were exclusively directed towards minimizing Sambursky's overall sentence after the state court rejected the first plea agreement.  (Docket No.  7-13 p. 75; 7-13A, p. 5-9).  And, it was the result of these efforts that a second plea agreement was negotiated that capped Sambursky's total prison time at thirty years and left open the opportunity for arguing for a lesser period of incarceration, keeping in mind that the court had already rejected the earlier plea agreement that limited his jail time to twenty-one years.

While there is the evidence that Sambursky inquired about his eligibility for parole at some point during the plea negotiation process, there is no credible evidence this was what primarily motivated him to agree to the second plea agreement.[4]  Counsel testified the principal focus of his discussions with Sambursky was always on the total years of imprisonment that the court would impose, and that when it got down to deciding what to do, there never was any discussion or speculation about the actual time Sambursky would end up serving given the possibility of parole. (Docket No.  7-13, pp. 75, 13A, pp. 5-9).  This also was the testimony of counsel's partner who had represented Sambursky on other matters and who discussed the case from time-to-time with both counsel and Sambursky.  (Docket No. 7-13, p. 86-88, 91-92).  While Sambursky disputes this, the state court determined that counsel's testimony was truthful with respect to this and other matters and that his was not.

---

[4]  There is mention in the record of Sambursky being able to seek a pardon from the 85% minimum service requirement, which would then make him eligible for parole earlier.  (Docket Nos. 7-8A, p. 0052; 7-9, p. 5).  Presumably, this would require an application to the pardon board with the Governor having the final say in accordance with the provisions of N.D.C.C. ch. 12-55.1.  How realistic an opportunity this might be for a sex offender with multiple convictions cannot be determined from the record, but, obviously, it could vary considerably depending upon who is the Governor.

More significantly, however, Sambursky's own statements reflect that his primary concern when he entered his pleas was minimizing his overall sentence. In an affidavit filed in support of his state-court application for post-conviction relief, Sambursky stated the following in an attempt to advance an argument, now abandoned, that the sentencing judge was biased:

> I feel that Judge Kleven was biased against me in most of the proceedings, she was under a lot of public scrutiny because my case was very public and also because the Alfonso Rodriguez case was in full swing and was receiving national media attention. She unfairly drew similar lines between his case and mine. **The judge even said that she wishes she could put me away for 60 years and told the media that a "stiffer sentence was called for because I brought on a climate of fear in the community."** This was when I was still supposed to be innocent until proven guilty. **Before she made this comment she denied my original plea agreement, thus I changed my guilty to plea to not guilty. I honestly felt that if I didn't sign this next agreement that I would be put away for the rest of my life**.

(Docket No. 7-10A) (emphasis added).

In summary, Sambursky has failed to carry his burden of demonstrating that there is a reasonable probability he would have pled not guilty and gone to trial had he been correctly advised as to his parole eligibility. In fact, given Sambursky's own statements, the issue is not even close or debatable.

## IV.   CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also, United States v. Lambros, 404 F.3d 1034, 1036-1037 (8th Circ. 2005); Garrett v. United States, 211 F.3d 1075, 1076-1077 (8th Cir. 2000).

In this case, while the state-court's conclusion that Sambursky failed to satisfy the first Strickland prong may be debatable, what is not "debatable" is  Sambursky's failure to satisfy the second Strickland prong, particularly given his own statements.  Consequently, it is recommended that the court not issue a certificate of appealability.

## IV.    CONCLUSION AND RECOMMENDATION

Sambursky is not entitled to habeas relief and an evidentiary hearing is not required given that Sambursky was afforded a state-court hearing where he was represented by counsel and where had the opportunity to marshal evidence in support of his claim, including calling witnesses.

Therefore, it is hereby **RECOMMENDED** that:

1.    Respondent's Motion to Dismiss (Docket No.  5) be **GRANTED** and Sambursky's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Docket No. 2) be **DENIED**.

2.    The court certify that an appeal from the denial of this action may not be *taken in forma pauperis* because such an appeal would be frivolous and cannot be taken in good faith.

3.     A certificate of appealability not be issued.

## NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within fifteen (15) days after being served with a copy of this Report and Recommendation.  Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 17th day of March, 2009.

*s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court